UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEBRADRE D. JACKSON,

       Plaintiff,

v.               Case No. 16-cv-1584-pp

ROBIN DIEBOLD, *et al.*,

       Defendants.

---

**DECISION AND ORDER GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 24) AND DISMISSING THE CASE.**

---

  The plaintiff, a Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his civil rights at Racine Correctional Institution ("RCI"). Dkt. No. 1. The court screened the complaint, and allowed the plaintiff to proceed with a Fourteenth Amendment claim that Robin Diebold, Brad Londre, Michael Giernoth and Steven Johnson subjected him to discipline without proper process. Dkt. No. 7 at 6-7. The court noted in the screening order that the plaintiff provided very few facts about how he was "disciplined," and that he would need to provide more information to determine whether his "liberty" interest was at stake. Id. at 7. The plaintiff specified that he was disciplined by being forced to participate in a mandatory "Behavior Modification Program." Dkt. No. 32 at 2-3. The defendants have filed a motion for summary judgment. Dkt. No. 24. The court will grant that motion.

I. **Factual Background**[1]

The plaintiff is an inmate at RCI. Dkt. No. 26, ¶1. The defendants are, or were, DOC employees who worked at RCI: Steven Johnson is Deputy Warden, id. at ¶9; Brad Londre is a lieutenant who supervises all correctional officers on an assigned shift, id. at ¶¶2-3; Robin Diebold is unit manager in Ozaukee Unit, id. at ¶4; and Michael Giernoth is a former captain who supervised the Restrictive Housing Unit ("RHU"), id. at ¶¶6-8.

The plaintiff was housed in a "general population" unit called Ozaukee Unit. Id. at ¶14. On June 26, 2016, a prescription medication called Gabapentin went missing from a medicine cabinet near the officer's station in Ozaukee Unit. Id. at ¶ 13. Londre and Diebold watched security camera footage and saw several inmates, including the plaintiff, near the officer's station and medicine cabinet. Id. at ¶¶15-16. According to Londre and Diebold, it appeared that some inmates were districting unit staff while the plaintiff leaned over and grabbed something from the medicine cabinet. Id.

Based on what Londre and Diebold saw in the video, they decided to place all of the inmates they saw on the video in Temporary Lock-Up ("TLU") pending an investigation into the missing prescription medication.[2] Id. at ¶17.

---

[1] The court takes facts in this section from the defendants' proposed findings of fact, dkt. no. 26, the plaintiff's response to the defendants' proposed findings of fact, dkt. no. 34, the plaintiff's additional findings of fact, dkt. no. 35, and the plaintiff's sworn complaint, dkt. no. 1, which the court construes as an affidavit at summary judgment. See Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).

[2] TLU is located in RHU. Dkt. No. 26 at ¶19.

Both parties agree that TLU is "non-punitive," and is used for investigating major offenses, such as theft of prescription medication. Id. at ¶¶22-25; Dkt. No. 34 at ¶¶22-25. Both parties also agree that TLU is not "disciplinary," even though an inmate's property rights may be limited while he's there. Dkt. Nos. 26 at ¶¶22-23; 34 at ¶¶22-23. The parties do not dispute any aspect of the plaintiff's placement in TLU. Dkt. No. 32 at 2.

Once the inmates were placed in TLU, Diebold began her investigation to determine who was involved in the theft. Dkt. No. 26 at ¶37. She reviewed security video footage and talked to other inmates and unit staff. Id. at ¶38. Diebold could not definitely conclude that the plaintiff had taken the medication, because the security video footage was not of good quality. Id. at ¶39. As a result, she did not give the plaintiff a conduct report for the incident. Id. at ¶40.

On July 5, 2016, after Diebold had completed her investigation, prison staff released the plaintiff from TLU. Id. at ¶41. Diebold, Giernoth, Johnson and another officer had a discussion about where to transfer the plaintiff after TLU. Id. at ¶¶48, 101. According to the defendants, one option was the "Green Unit," which serves as an intermediary between general population and RHU. Id. at ¶¶43-44, 46. Inmates may be placed in Green Unit as a "step down" from RHU, or alternatively, may be placed in Green Unit to prepare for placement in RHU. Id. at ¶44. According to the plaintiff, another option was to take him back to Ozaukee Unit, where he had been housed before the incident. Dkt. No. 32 at 2.

3

The parties agree that Green Unit is called a "general population" unit. No. 26 at ¶43; see also Dkt. No. 34 at ¶43. According to the defendants, because Green Unit is a part of the general population unit, it is not disciplinary and no hearing is required prior to transfer there. Id. at ¶¶46, 72. The plaintiff disputes this, asserting that although Green Unit is "labeled" a "general population" unit, "in reality it is disciplinary." Dkt. No. 34 at ¶¶41, 43, 46; see also dkt. no. 35 at ¶3.

The parties also agree on the conditions of confinement in Green Unit. Dkt. No. 26 at ¶¶76-85; see also Dkt. No. 34 at ¶¶76-85. Inmates receive a yellow uniform that they must wear at all times while out of their cells. Id. at ¶¶76, 88-90. While in their cells, inmates can wear personal clothing. Id. at ¶¶88-90. All personal property is inventoried and delivered within three business days of arriving in Green Unit. Id. at ¶ 76. Inmates are allowed free movement, meaning they are not restrained or under guard escort when out of their cells. Id. at ¶80. Inmates have access to the dayroom, which has a telephone, television, cards, games and reading and writing materials. Id. at ¶¶81-82.

According to the plaintiff, the Green Unit's "Behavior Modification Treatment" program converts it from a "general population" unit to "disciplinary status." Dkt. No. 34 at ¶72. The plaintiff does not describe what he had to do as a part of the "Behavior Modification Treatment" program, but he states that it is a "level system" where "inmates . . . have to participate in programming to advance from level A, B and C." Dkt. No. 32 at 3-4. The

4

plaintiff compares the Green Unit's "level" program with the RSU's "step" program, where inmates similarly have to participate in programming to advance from step 1 to steps 2 and 3. Id. He characterizes each of the programs as "[p]unitive in that with each step earned you have to earn back a privilege they arbitrarily took from you." Id. at 4.

The defendants indicate that the Behavior Modification Treatment program is used for inmates who disregard rules or "have had trouble adjusting to the correctional setting." Dkt. No. 26 at ¶¶45, 71. The level system, they say, "rewards participation in programming and demonstration of pro-social behavior." Id. at ¶¶73, 86. Participation in the program determines the length of stay in Green Unit and the level of privileges allowed. Id. at ¶75. In level A, inmates have the following rules and privileges: one indoor recreation per day, one outdoor recreation per day, four hours in the dayroom, no electronics, and no personal clothing out of cell (must year yellow at all times when out of cell). Id. at ¶88. In level B, inmates get all of the above and an additional outdoor recreation period. Id. at ¶89. In level C, inmates get all of the above, an additional indoor recreation period, access to electronics and two additional hours in the dayroom. Id. at ¶90.

Diebold, Giernoth, Johnson and the other officer decided to transfer the plaintiff to Green Unit after TLU. Id. at ¶¶48, 101. They thought Green Unit was the best option given the plaintiff's history of non-compliance with prison rules. Id. at ¶52. The plaintiff had received nine conduct reports since transfer to RCI in February 2015. Id. They also believed that transfer to Green Unit

5

would serve as a "fresh start," so that the plaintiff would be separated from inmates who may have encouraged behavior that led to his past TLU placements. Id. at ¶51. The plaintiff, on the other hand, says that there was "no reason" for him to be restricted from "normal [general population] privileges," or for him to have to earn those privileges back. Dkt. No. 32 at 3. He notes that there is no formal report or findings on what factors Diebold, Giernoth, Johnson and the other officer considered before placing him in Green Unit. Dkt. No. 34 at ¶49; see also Dkt. No. 35 at ¶5. He also points out that the four other inmates allegedly involved in the incident also were sent to Green Unit, which means that he was not separated from them. Dkt. No. 35 at ¶6.

On July 8, 2016, a few days after the plaintiff's transfer to Green Unit, he spoke with Johnson and told Johnson that he thought his placement in Green Unit was disciplinary because Green Unit was similar to RHU. Dkt. No. 26 at ¶¶55-56. Johnson told the plaintiff that Green Unit was not disciplinary, because he could freely leave his cell and did not have to be restrained or under guard escort for movement. Id. at ¶57. The plaintiff then wrote a letter to Johnson regarding the same issue, and Johnson responded with the same answer. Id. at ¶¶58-59. On September 21, 2016, the plaintiff was transferred to Washington Unit, a general population unit. Id. at ¶60. By the court's calculations, the plaintiff was housed in Green Unit for about eighty days.

6

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed, or is genuinely disputed, must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.  Fourteenth Amendment Due Process Standard

To prevail on a Fourteenth Amendment due process claim, the plaintiff must establish that he had a "liberty interest" in not being placed on the behavior modification treatment program without notice and an opportunity to be heard. See Gillis v. Litscher, 468 F.3d 488, 491–92 (7th Cir. 2006); see also Jiles v. Breen-Smith, No. 08-CV-464-SLC, 2009 WL 4827065, at *8 (W.D. Wis. Dec. 8, 2009) (citing Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460 (1989)). In the absence of a liberty interest, "the state is free to use any procedures it chooses, or no procedures at all." See Montgomery v. Anderson, 262 F.3d 641, 644 (7th Cir. 2001).

To trigger a liberty interest, the "behavior modification program must impose an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. See Sandin v. Conner, 515 U.S. 472, 483-484 (1995). Placement in a behavior modification program may be "atypical and significant" if the length of the program is substantial and the record reveals that the conditions of confinement are unusually harsh. Marion v. Columbia Correctional Inst., 559 F.3d 693, 697-98 (7th Cir. 2009). Following the Supreme Court's decision in Sandin, courts have concluded that protected liberty interests essentially are limited to the loss of good-time credits or placement for an indeterminate period in one of the country's super-maximum security prisons, such as the Wisconsin Secure Program Facility. See Jiles, 2009 WL 4827065, at *8 (citing Wilkinson v. Austin, 545 U.S. 209, 223-224 (2005)).

C. Application of the Law to the Facts

1. *Defendant Londre*

The defendants assert that Londre's involvement in this lawsuit is limited to placing the plaintiff in TLU on June 28, 2016. He was not personally involved in the alleged constitutional violation regarding the decision to place the plaintiff in the behavior modification program in the Green Unit. See Dkt. No. 26 at ¶¶92-94; see also Dkt. No. 36 at 2. The plaintiff agrees that placing him in TLU was Londre's only role in the incident, see dkt. no. 34 at ¶¶92-94, and indicates that he is proceeding with a claim that only Giernoth, Diebold and Johnson placed him in Green Unit without due process, see dkt. no. 34 at ¶¶11. The court will dismiss Londre as a defendant

2. *Defendants Diebold, Giernoth and Johnson*

The defendants assert that they are entitled to summary judgment because the plaintiff had no liberty interest in avoiding placement in the Behavior Modification Treatment Program in Green Unit. They note that the Green Unit is a general population unit where the plaintiff received food, clothing, linens, mail, health services and showers. The plaintiff had free movement (in that he was not locked in his cell at all times), and he received indoor and outdoor recreation periods. He also had several hours in the dayroom, which had a telephone, TV, cards, games and reading and writing materials.

The plaintiff's chief complaints with Green Unit appear to be that he could not have certain items in his cell (a TV, radio and fan), and that he had

9

to wear his yellow uniform during family visits. See Dkt. No. 1 at 2-4. These conditions are not the kinds of atypical and significant hardships that trigger a liberty interest.

In Gillis, the Seventh Circuit concluded that an inmate's placement in a behavior modification program could trigger a liberty interest, because the inmate was forced to sleep naked in his cell without bedding or a mattress for five days, only received toilet paper on five occasions (during a nine day time period), and was denied soap and a shower until the ninth day. 468 F.3d at 490–92. In Townsend, the plaintiff's behavior action plan required him to "spen[d] a period of weeks completely naked, with no clothing, shoes, bedding, linens, mattress, mail or legal materials." See Townsend v. Cooper, 759 F.3d 678, 687 (7th Cir. 2014). In a district court, Kelley v. Pollard, the court concluded that the inmate's placement in a behavior modification program could trigger a liberty interest because he was denied a shower, soap or a towel for one month; then, for four months, he had no access to bedding or a mattress, and was allowed to brush his teeth and cut his hair and nails only once. See Kelley v. Pollard, No. 08-CV-535-slc, 2008 WL 4862363, at *4 (W.D. Wis. Nov. 6, 2008). In contrast to these atypical and significantly harsh conditions, the fact that the plaintiff did not have certain items in his cell and had to wear yellow when he met with visitors does not trigger a liberty interest sufficient to mandate Fourteenth Amendment due process.

The plaintiff argues that there is no process or policy to determine whether an inmate has to participate in the Behavior Modification Treatment

Program. Dkt. No. 35 at ¶7. He states that there were no contemporaneous records from the defendants describing why he was sent to the Green Unit. Dkt. No. 34 at ¶¶49, 51. This may be the case. But because the Behavior Modification Treatment Program did not trigger a liberty interest, the defendants were free to use any procedure they chose—or no procedures at all—to determine whether the plaintiff had to participate in the program.

The plaintiff also argues that the defendants intended to punish him by sending him to Green Unit, because everyone who was caught on tape was sent to Green Unit. Dkt. No. 35 at ¶6. Diebold allegedly told the plaintiff that he was caught with his hands in the "cookie jar." Id. at ¶8. The plaintiff points out the similarities between the step program in the RHU and the behavior modification in Green Unit, asserting that both function on a system where inmates must "earn back a privilege they arbitrarily took from you." Dkt. No. 32 at 4. But the question is not whether a program might exact some form of punishment. The question for Fourteenth Amendment purposes is whether that punishment is so atypical and significantly harsh that it triggers a liberty interest. The "punishment," if it is that, that results from being in the behavior modification program on the Green Unit is less significant that the "punishment" at RHU, and again, is not significant enough to trigger a liberty interest.

Finally, the plaintiff's placement in Green Unit was not "arbitrary." The plaintiff agrees that Green Unit is often used as a middle step between TLU and general population. See Dkt. No. 34 at ¶44. In other words, the defendants did

not approach the plaintiff out of the blue one day and decide to take him to Green Unit. Instead, they placed him in Green Unit after he had been in TLU for ten days. They used a transition process that the plaintiff does not dispute is used with other inmates being moved to or from a more restrictive unit to a less restrictive one. The plaintiff argues that, rather than moving him to Green Unit first, the defendants could have put him right back into general population. That may be true (although the defendants explain why they did not do so). Again, however, the issue is not whether the defendants had other options. The issue is whether the option they chose—putting the plaintiff in the behavior modification program on Green Unit—was so atypical and significantly harsh that it triggered a liberty interest. As the court has stated several times, it was not.

The court will grant summary judgment in favor of the defendants and will dismiss the case.

**III. Conclusion**

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 19.

The court **ORDERS** that this case is **DISMISSED**. The clerk of court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely

requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 22nd day of March, 2018.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**